# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CHAD ST. PIERRE, ET AL.**                    **CIVIL ACTION**

**VERSUS**

**DUPONT SPECIALTY PRODUCTS**
**USA, LLC, ET AL.**                    **NO. 22-00781-BAJ-RLB**

## RULING AND ORDER

This is an age discrimination case. Plaintiffs Chad St. Pierre and Patrick Wright sued their former employer, Defendant Dupont Specialty Products USA, LLC under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*, as amended (ADEA). (Doc. 1). Now before the Court is Dupont's Motion for Summary Judgment. (Doc. 29). The Motion is opposed. (Doc. 33). With leave of the Court, Plaintiffs filed a surreply, (Doc. 49), in response to Dupont's reply, (Doc. 41). For the reasons that follow, Dupont's Motion will be denied.

## I.    BACKGROUND

### A. Summary Judgment Evidence

The following facts are drawn from Dupont's Statement of Material Facts (Doc. 29-8, *hereinafter* "Dupont SOF"), Plaintiffs' Response to Dupont's Statement of Material Facts (Doc. 33-30, *hereinafter* "Response SOF"), Dupont's Reply to Plaintiffs' Statement of Additional Facts (Doc. 41-2, *hereinafter* "Dupont Reply SOF"), the parties' joint Pretrial Order (Doc. 44, *hereinafter* "Joint PTO"), and the record evidence submitted in support of these pleadings.

Plaintiff Chad St. Pierre started working at Dupont in 1995. (Doc. 37-4 ¶ 4). In 2016 or 2017, St. Pierre became E & C[1] Supervisor at Dupont's Pontchartrain Facility in LaPlace, Louisiana. (Joint PTO at 4). Plaintiff Pat Wright also started working at Dupont in 1995, and in 2020 he was working as an E & C Technician under St. Pierre's supervision. (Doc. 29-3 at 11). On October 14, 2020, both St. Pierre and Wright were terminated for willfully violating a Life Saving Rule. (Doc. 37-7 at 1; *see* Doc. 37-3 at 4). At the time, St. Pierre was 47 years old and Wright was 59. (Joint PTO at 5).

The Dupont Pontchartrain Facility is an industrial manufacturing site. (Doc. 29-1 at 2). To protect the safety of workers at the site, Dupont imposes mandatory Life Saving Rules. (Doc. 29-4 at 28). One of these rules is the Lock Tag Rule, which prohibits work on energy sources for equipment unless it is de-energized, tested, and "locked out." (Doc. 29-1 at 3 (citing Doc. 29-4 at 5–21)). Once these steps are completed, and equipment is safe to work on, the key for the lock on the de-energized energy source is stored in a separate "lock-out box." (*Id.*). For added protection, employees and contractors working on the equipment secure their own locks on the "lock-out box." (*Id.*). This way, the equipment can only be re-energized once each person working on it has removed their lock. (*Id.*). If the owner of a lock is offsite and the lock must be removed, the Lock Tag Rule details specific steps to follow before the lock may be forcibly removed, which include receiving permission from a supervisor

---

[1] E & C refers to the Electrical and Control group, a unit responsible for instrumentation and electrical. (*E.g.*, Doc. 37-2 at 67).

and completing a work permit request. (*Id.*). Individuals who violate or condone the violation of this rule may be fired. (Doc. 29-4 at 29). Both St. Pierre and Wright were trained on the Lock Tag Rule and understood the consequences of violating it. (Doc. 29-2 at 116; 29-3 at 31).

Sometime in the week of September 21, 2020, St. Pierre cut numerous locks on several locked-out breaker boxes for the facility's Waste Stripper System. (Doc. 29-2 at 26). Wright witnessed the removal of several locks, and then accessed the newly opened area to work on a motor within. (Doc. 29-3 at 21).

According to Plaintiffs, after determining that the locked-out machinery needed to be worked on, St. Pierre spoke to John Wiggins, the Production First Line Supervisor responsible for the lock-out system in question. (*See* Joint PTO at 10 (citing deposition testimony)). The two discussed options for accessing the lock-out box, decided that waiting for all employees to remove their locks was not feasible due to time constraints, and concluded that cutting the locks was the best option. (*Id.*). Wiggins said he would discuss the issue with Production Superintendent Milton Hill and would inform St. Pierre if Hill had any concerns about cutting the locks. (*Id.*). Neither Wiggins nor Hill expressed concerns to St. Pierre. (*Id.*). St. Pierre then informed his supervisor, Reliability and Maintenance Manager Mark Schorr, that he and Wiggins intended to cut the locks. (*Id.*). Schorr asked if Wiggins had issues with cutting the locks, and St. Pierre said no; Schorr also asked if cutting the locks was normally done, and St. Pierre said yes. (*Id.*). St. Pierre and Wright also testified that

E & C Technicians Scott Babin and Cody Ball were informed that the locks had been cut, (Doc. 44 at 11), although Ball denies this, (Doc. 29-4 at 37).

St. Pierre retrieved a large bolt cutter and then picked up Schorr in a golf cart to travel together to the location of the locks. (*Id.*). Wright testified that he saw St. Pierre and Schorr walking together while St. Pierre held the bolt cutters. (Doc. 29-3 at 15). St. Pierre testified that Schorr was present while at least one lock was cut. (Doc. 29-2 at 26).

In contrast, Schorr testified that he left the area before the locks were cut and does not recall seeing St. Pierre with bolt cutters. (Doc. 29-5 at 13). He also denies that he knew about the lock cutting. (*Id.* at 13). Hill similarly testified that he did not speak to St. Pierre about the plan to cut the locks. (Doc. 33-2 at 49:18–20).

The lock-cutting was discovered more than one week later, on October 5, 2020. (Doc. 29-4 at 38). That same day, St. Pierre and Wright were "escorted off site" and "[t]heir badge accesses were immediately revoked until [an] investigation [could] be completed." (*Id.* at 42). Todd McMorris and Hill began an investigation into the incident. (*E.g.*, Doc. 29-5 at 16). Once the investigation was brought to his attention, Schorr took over and "[began] to gather facts and details from members in the plant[,] . . . interview people[,] . . . type up notes[,] and collect all the information." (*Id.*). Both Plaintiffs provided written statements describing the incident and "[w]ho else witnessed or heard the incident." (Doc. 29-4 at 33, 34). Notably, in neither statement did St. Pierre or Wright suggest that Schorr was present or that anyone other than Wiggins was aware of the lock cutting. (*Id.*).

The results of the investigation, and a recommendation to terminate St. Pierre and Wright, were presented to Plant Manager Jelena Oubre, who, based on input from her "entire staff and human resources," made the final decision to fire Plaintiffs. (Doc. 29-7 at 9). Termination was recommended because the violation of the Life Saving Rule had been willful. (Doc. 29-5 at 26). Schorr "was personally involved in creating and reviewing the contents of the [investigation summary], and . . . was personally present for its presentation to [ ] Oubre." (Doc. 29-4 at 3). Wiggins, whose involvement in the incident was revealed during the investigation, was also terminated for being aware of the rule violation and taking no action, and attempting to cover up his role in the decision to cut the locks. (*See id.* at 14; Doc. 29-4 at 49).

Despite disputes over who was present when St. Pierre cut the locks and who was aware that the locks were cut, Oubre testified that she was not aware that Schorr or anyone else knew of the lock cutting. (Doc. 29-7 at 13). Likewise, the investigation summary presented to Oubre only referred to the involvement of St. Pierre, Wright, and Wiggins. (*See* Doc. 29-4 at 38–49).

The parties apparently agree that Wright was replaced by an employee who was under 40 years old. The parties dispute, however, who replaced St. Pierre. Dupont alleges that St. Pierre's role was awarded to Jeff Ragan, who was 54 at the time, in March 2021. (Dupont SOF ¶ 35–36; Dupont Reply SOF ¶ 35). Plaintiffs instead allege that the role went to Scott Babin, who was under 40 at the time. (Plaintiffs' SOF ¶ 35). In his July 2023 deposition, Babin testified that Ragan replaced St. Pierre's role until the maintenance crew was split in February 2023, at which

point Ragan was made supervisor of one group and Babin was given St. Pierre's role. (Doc. 29-7 at 8:10, 10:6–11:1).

## B. Procedural History

On June 25, 2021, St. Pierre filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and received a right-to-sue letter on July 13, 2022. (Doc. 1 ¶ 4). On May 4, 2021, Wright filed a charge of discrimination with the EEOC. (*Id.* ¶ 6). On October 6, Wright's investigation was transferred to the Louisiana Commission on Human Rights, which issued a right-to-sue letter on September 27, 2022. (*Id.*).

On October 10, 2022, Plaintiffs initiated this action against Dupont and Defendant DuPont de Nemours, Inc., alleging they were terminated due to age in violation of the ADEA. (*See* Doc. 1 ¶ 24). On November 18, Plaintiffs stipulated to the dismissal of Dupont de Nemours, Inc. pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). (Doc. 15).

Now Dupont moves for summary judgment, arguing that Plaintiffs cannot show that age was the but-for cause of their termination. Instead, Defendant argues, both Plaintiffs were fired for the willful violation of the Lock Tag Rule. (Doc. 29). The Motion is opposed. (Doc. 33). With leave of the Court, Plaintiffs filed a surreply, (Doc. 49), in response to Dupont's reply, (Doc. 41).

## II.    LAW AND ANALYSIS

### A. Standard

Federal Rule of Civil Procedure 56(a) provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant bears its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. Stated differently, "[i]f the party with the burden of proof cannot produce any summary judgment evidence on an essential element of [their] claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### B. Discussion

The ADEA prohibits employers from discharging an individual because of age. 29 U.S.C. § 623(a). To establish a claim for violation of the ADEA, a plaintiff "must show that age was the 'but-for' cause of his termination – proving that age was a 'motivating factor' for the decision is not enough." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)). A plaintiff may prove that age was a "but-for" cause of his termination with direct or circumstantial evidence. *Id.* at 455–56.

7

When a plaintiff offers no direct evidence of age discrimination, the *McDonnell Douglas* burden-shifting framework applies. *Id.* at 456. The burden is first on the plaintiff to establish a *prima facie* case of age discrimination. *Id.* To do so, "a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)).

If the plaintiff establishes a *prima facie* case, there is a presumption of discrimination, and the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff." *Berquist*, 500 F.3d at 356 (quotation omitted). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). In other words, a defendant meets its burden of production if its stated reason, "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Hicks*, 509 U.S. at 509) (emphasis omitted).

Lastly, if the defendant articulates a legitimate, non-discriminatory reason, "the plaintiff must rebut the employer's purported explanation by showing that the reason given is merely pretextual." *McMichael*, 934 F.3d at 456. "To show pretext, a

8

plaintiff must present enough evidence for a reasonable jury to believe that [the employer's] 'reasons are pretexts for unlawful discrimination.'" *Id.* at 456-57. "A plaintiff can do so by showing that: (1) a discriminatory reason more likely motivated the employer; (2) the employer's reason is unworthy of credence; or (3) he is clearly better qualified than the person selected for the position." *Id.* at 457 (internal citations and quotations omitted). "At summary judgment, [a plaintiff] must offer enough evidence to raise a genuine question of fact regarding [the employer's] reasons for firing him." *Id.* at 456.

### i.    Plaintiffs' *prima facie* case

The parties do not dispute that Wright has established a prima facie case of age discrimination. (*See* Doc. 41 at 4 n.11). Dupont does challenge, however, whether St. Pierre has successfully done so. St. Pierre was 47 years old when he was terminated on October 14, 2020. (Doc. 37-4 ¶ 6). Dupont claims that St. Pierre's position was unfilled until March 1, 2021, when it was filled by Jeff Ragan, who was 54 years old. (Doc. 29-1 at 13 (citing Doc. 29-4 ¶ 20). Plaintiffs contend instead that Scott Babin, who was under 40 at the time, eventually replaced St. Pierre. (*See* Doc. 33 at 14–15). In support, Plaintiffs cite to St. Pierre's own sworn declaration testifying as much. (*Id.* (citing Doc. 37-4 ¶ 12)). Plaintiffs also cite to Babin's deposition, in which Babin testified that Ragan took the place of St. Pierre until the group was split in February 2023, at which point Ragan was made supervisor of one group and Babin was given St. Pierre's role. (Doc. 29-7 at 8:10, 10:6–11:1).

Dupont argues that St. Pierre's declaration does not establish that he has the requisite personal knowledge necessary for consideration at summary judgment because St. Pierre testifies to events that occurred after he left Dupont. (Doc. 29-1 at 4). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). St. Pierre's declaration, in which he states that "[Ragan] was only temporarily detailed as a supervisor . . . to handle [St. Pierre's] former duty of approving employee timecards in Dupont's Maintenance Department," (Doc. 37-4 ¶ 12), includes the statement that he has "personal knowledge of the facts stated herein," (*Id.* ¶ 3).

The Court will accept this assertion of personal knowledge at this stage because it is reasonable to infer that St. Pierre, who worked at Dupont for more than 25 years, was familiar with the status of his former position. *See LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (holding district court did not err in relying on affidavits which "contain[ed] sufficiently specific statements for the district court to infer that the affiants had personal knowledge of the facts attested therein"); *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) (explaining that at summary judgment, a court views all facts and

inferences in the light most favorable to the nonmovant).[2] St. Pierre's declaration is indeed self-serving, and Dupont disputes its substance, but Dupont may call into question the basis of St. Pierre's knowledge and probe any potential bias at trial. *See C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) ("A party's own testimony is often "self-serving," but we do not exclude it as incompetent for that reason alone.").

Even though the evidence certainly appears to weigh in favor of Dupont's position,[3] the Court at this stage is not permitted to weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) ("[A court at the summary judgment stage] may not make credibility determinations or weigh the evidence."). Dupont will have the opportunity to challenge St. Pierre's bias, credibility, and personal knowledge at trial. In sum, for purposes of summary judgment, the Court finds that St. Pierre has established a prima facie case of age discrimination.

---

[2] Moreover, if St. Pierre learned about who filled his prior role from an employee at Dupont, testimony to that effect could qualify as a non-hearsay statement of party opponent under Fed. R. Evid. 801(d)(2)(D). *See, e.g., Namer v. Am. Internet Servs., LLC*, No. CV 15-3317, 2016 WL 828223, at *5 (E.D. La. Mar. 3, 2016) ("[A]n out-of-court statement of a declarant is not hearsay if it is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." (quotation omitted)).

[3] On one hand, Dupont presents a declaration swearing that Ragan replaced St. Pierre. (Doc. 29-4 ¶ 20). This is further supported by Babin's testimony that Ragan "replaced" St. Pierre, although Babin ultimately filled the role. (Doc. 37-9 at 90:4). On the other hand, Plaintiffs present a declaration swearing that Ragan only partially filled St. Pierre's role, and that Babin eventually "took over all of [St. Pierre's] former duties." (Doc. 37-4 ¶ 12).

### ii. Dupont's legitimate, non-discriminatory reason for terminating Plaintiffs

Here, Plaintiffs do not dispute that Dupont's has produced evidence of a legitimate, non-discriminatory reason for Plaintiffs' termination, as is Dupont's burden after Plaintiffs make a *prima facie* case of discrimination. *Cline v. Par.*, 622 F. App'x 423, 425 (5th Cir. 2015). Instead, Plaintiffs challenge that reason as pretextual.

### iii. Plaintiffs' evidence that Dupont's reason for terminating Plaintiffs was pretextual

Plaintiffs have put forward the following arguments that a discriminatory reason more likely motivated their termination, and that Dupont's proffered reason for terminating them is unworthy of credence: (1) other employees cut locks in violation of the Lock Tag Rule and went unpunished; (2) younger employees who violated a different Life Saving Rule were not terminated; (3) remarks about Wright's age show the real reason for Plaintiffs' termination; and (4) Schorr was present for the violation and later led the investigation into it, and other employees involved in the investigation were also aware of the incident. The Court will address each argument in turn.

### 1. Other violations of the Lock Tag Rule

Plaintiffs argue that Dupont employees routinely deviated from the Lock Tag Rule such that Dupont's termination of Plaintiffs for doing so was pretextual. (*See* Doc. 33 at 22–26).

12

To show discrimination through disparate treatment, a plaintiff must "identify [] comparators and 'produce . . . evidence that they were similarly situated employees.'" *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 827 (5th Cir. 2022) (quoting *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 515 (5th Cir. 2001) (cleaned up)). And a plaintiff is only similarly situated to other employees if their "situation[s] [are] nearly identical." *Okoye*, 245 F.3d at 514–15 (collecting cases). "The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage, is a stringent standard—employees with different responsibilities or different supervisors are not considered to be 'nearly identical.'" *Lewis v. Home Depot USA, Inc.*, Civil No. A-06-CA-058-LY, 2007 WL 1100422, at *5 (W.D. Tex. Apr. 10, 2007) (citing *Okoye*, 245 F.3d at 514–15).

Here, Wiggins testified that employees above and below him in the chain of command violated cut locks without permission and were not terminated. (*See* Doc. 33-1 at 36:12–16). Wright testified that he, St. Pierre, and employees Mitch Cortez and Cody Ball cut numerous locks in 2014 or 2015 under a different supervisor. (Doc. 29-3 at 23–24). Employee Donald Brack testified in 2023 that locks were cut numerous times, although the most recent incidents he was aware of occurred more than ten years prior. (Doc. 37-11 at 11:25–13:3). St. Pierre himself swears to the following: he and Milton Hill "discussed deviations from Dupont's written lifesaving rule" on "numerous" occasions, (Doc. 37-4 ¶ 13); in his career at Dupont he "had at least twenty . . . such meetings with the Production Supervisor wherein [they] considered and evaluated deviation[s] from Dupont's written lifesaving rules and

13

implemented such deviations," (*Id.* ¶ 14); in 2016, he, the Production Supervisor, and the then Plant Manager "met, considered, and decided" to approve "a deviation in the form of cutting the production locks" after which he "cut . . . locks," (*Id.* ¶ 15); he and his team cut locks without a permit "at least two . . . times per year for three . . years" up to 2018, (*Id.* ¶ 16); and he cut locks in 2020 "after discussing and evaluating the safety of [the] deviation with Milton Hill," (*Id.* ¶ 17).

Although Plaintiffs have put forward plenty of evidence that employees violated the Lock Tag Rule, they have put forward no evidence showing that Plant Manager Oubre, who made the final decision to terminate Plaintiffs, or Schorr, who led the investigation into Plaintiffs' violation, were aware of those other incidents. This nexus is essential to showing pretext through disparate treatment, and its absence dooms Plaintiffs' argument. *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (holding that circumstances were not nearly identical when employees actions were reviewed by different supervisors); *King v. W.W. Grainger Inc.*, 502 F. App'x 360, 362 (5th Cir. 2012) (Without more, the mere fact that two female workers were disciplined less harshly than some male workers is hardly sufficient to prove sex discrimination . . . [and] [t]his is especially true where the workers' conduct was different from one another and the sanctions placed on the female workers came from a different supervisor."); *Harkness v. Bauhaus U.S.A., Inc.*, 86 F. Supp. 3d 544, 560 (N.D. Miss. 2015) ("[D]ifferent supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous

supervisor did not consider important, differences in the evaluation of . . . performance do not establish a genuine issue on pretext." (quotation omitted)).

### 2. Younger employee who violated different Life Saving Rule was not terminated.

Plaintiffs next argue that Dupont's reason for termination were pretextual because a younger employee violated a different Life Saving Rule and was not terminated. (*See* Doc. 33 at 15–17). This employee was Chet Worthy, whose violation of a Life Saving Rule related to high energy equipment led to another employee's hospitalization. (Docs. 29-1 at 18; Doc. 49 at 10). In that situation, unlike in Plaintiffs', Dupont determined that the rule broken by Worthy was not well understood. Oubre acknowledged that "there is a lifesaving rule on high energy equipment," but "after the investigation," "it . . . [became] clear that [the employees], in general, were not aware" of the steps required by the rule. (Doc. 29-7 at 10). In her words, the "management systems failed so [Worthy] was not trained to follow those rules." (*Id.*). Likewise, McMorris testified that "[t]hrough the investigation, it was determined that [Worthy] was not properly trained." (Doc. 37-6 at 45:10–11). Schorr also testified that based on the investigation, it was determined that Worthy's violation was not "willful." (Doc. 29-5 at 27).

For their part, Plaintiffs have put forward no evidence contesting Dupont's asserted reason for not terminating Worthy. Unlike the undisputed evidence regarding Worthy's violation, Plaintiffs were found to have willfully violated a rule that no evidence suggests was poorly understood. Indeed, both Plaintiffs admitted

knowing that there was a rule preventing them from cutting locks under the circumstances present in September 2020. (*See* Plaintiffs SOF ¶ 10; Doc. 29-3 at 31). As such, there is no dispute that Worthy was not similarly situated to Plaintiffs and this argument in support of pretext fails. *Eyob v. Mitsubishi Caterpillar Forklift America, Inc.*, 2017 WL 3215171, *7 (S.D. Tex. July 28, 2017) ("The 'nearly identical standard' is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, *different work rule violations*, or disciplinary records are not considered to be 'nearly identical.'" (quoting *Player v. Kansas City S. Ry. Co.*, 496 F.App'x. 479, 481 (5th Cir. 2012) (emphasis added)).

### 3. Remarks about a different employee's age

Plaintiffs also argue that remarks about employee age by Hill, a supervisor in a different department, to Wiggins support their argument for pretext. (*See* Doc. 33 at 19–21). Workplace remarks offered not as direct evidence but as "circumstantial evidence alongside other alleged discriminatory conduct" must satisfy a two-part test, under which the plaintiff must show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Allen v. United States Postal Serv.*, 63 F.4th 292, 302 (5th Cir. 2023) (quotations omitted).

Wiggins testified that "[Hill] told me pointblank that we want to get a younger supervisor. You want me to give you a break off of shift. Get somebody younger in there." (Doc. 33-1 at 137:2–4). Wiggins ultimately remained in his position and no one younger was hired. (*Id.* at 137:11–13). Wiggins also testified that Hill's son told

16

Wiggins that "[Hill] was gonna run [Wiggins's] punk ass off," claiming this had to do with age as well.[4]

Neither remark satisfies the two-part test. The former remark was vague and not directed to either Plaintiff. Moreover, the absence of any implication that "senior [employees] were to be fired to make room for younger trainees" weighs against finding animus. *Lay v. Singing River Health Sys.*, 694 F. App'x 248, 256 (5th Cir. 2017) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)); *Kelly v. Costco Wholesale Corp.*, 632 F. App'x 779, 783 (5th Cir. 2015) (holding that remark about hiring younger employees could have meant that younger employees were needed "to help, instead of replace, the current employees"). The latter remark, relayed through Hill's son and therefore hearsay, does not mention age and does not suggest any animus related to age. For these reasons, Hill's remarks do not support Plaintiffs' pretext argument.

### 4. Dupont's investigation

Finally, Plaintiffs argue that Dupont's reason for termination was pretextual because Schorr and Hill approved Plaintiffs' rule violation, Schorr was present for the incident, and both Schorr and Hill were later involved in the investigation

---

[4] In its Motion, Dupont also disputes the legal significance of remarks by Schorr about whether Wright would be interested in retirement, (Doc. 29-1 at 11 n.4), but Plaintiffs do not refer to these remarks in support of their opposition. "It is well-settled federal law that arguments not presented to the district court in a response to a summary judgment motion are deemed waived." *See Dowling v. Harvey*, No. CV W-05-CA-314, 2006 WL 8436123, at *2 (W.D. Tex. Mar. 30, 2006) (collecting cases). Plaintiffs have accordingly waived this argument.

recommending termination. (*See* Doc. 33 at 21–22; 42-2 at 4–5).[5] Dupont responds that Oubre, who made the ultimate decision, was not aware of Schorr's presence when the lock was cut, Schorr did not have the authority to permit the violation, and Schorr would have been fired as well had Oubre known. (Doc. 41 at 7).

Faulty investigations do not necessarily demonstrate pretext. *See, e.g., Hinga v. MIC Group LLC*, 13-0414, 2014 WL 4273887 at *3 (S.D. Tex. Aug. 29, 2014) ("Importantly, in the case of an allegedly flawed investigation, a plaintiff must do more than show defendant's mistaken belief regarding the investigation's conclusions to survive summary judgment–plaintiff must show that defendant's belief was dishonest and masked a [retaliatory] purpose.") (citing *Swenson v. Schwan's Consumer Brands N. Am., Inc.*, 500 Fed.Appx. 343, 346 (5th Cir. 2012)). Rather, the question is whether the employer's explanation is honestly believed. *See Culver v. Gorman*, 416 F.3d 540 (7th Cir. 2005) ("[a]n employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action.") (citation omitted).

According to Plaintiffs, Schorr led an investigation into an incident that he approved and was present for, and then recommended the termination of Plaintiffs. Dupont argues that if true, the appropriate inference from this situation is that Schorr was acting out of self-interest to avoid termination himself. (Doc. 29-1 at 17).

---

[5] Plaintiffs also argue that other Dupont employees were aware that Plaintiffs cut the locks and were not terminated. (*See* Doc. 33 at 26–28 (referring to Mitch Cortez, Babin, and Cody Ball). But there is no evidence that Schorr or Oubre were aware that these employees knew, and the employees in question did not run the investigation. (*See* Plaintiffs SOF ¶ 28; Doc. 29-5 at 16–17).

Another plausible inference arising from Schorr's conflict of interest, however, is that the investigation itself was a pretext to hide Schorr and Dupont's real reason for wanting to terminate Plaintiffs—age. In other words, the impropriety of Schorr's role casts a shadow on the investigation, recommendation, and ultimate termination, making Defendant's explanation seem disingenuous.

Plaintiffs' version of events is disputed, of course, and Dupont will have ample opportunity to challenge it at trial.[6] But at this stage the Court finds that the disputed evidence regarding Schorr's role gives rise to an inference of pretext.

Although the Fifth Circuit recognizes that flawed investigations can be evidence of pretext, it rarely holds as such in any given case. This is because plaintiffs frequently challenge the investigatory process as insufficient. *See, e.g.*, *Medlock v. Ace Cash Exp., Inc.*, 589 F. App'x 707, 710 (5th Cir. 2014) (holding that evidence of insufficient investigation did not establish a discriminatory motive); *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("While the prudent action may have been to discuss the event with [plaintiff] and obtain his side of the story before terminating him, evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision."); *Jackson v. Blockbuster, Inc.*, No. 4:09-cv-119, 2010 WL 2268086, at *6 (E.D. Tex. June 4, 2010) ("Although it may have been advisable for [the employer] to investigate the veracity of the complaint by interviewing [the

---

[6] For instance, Plaintiffs' written statements from the investigation itself make no mention of Schorr's presence or approval. (Doc. 29-4 at 33, 34).

employee], the fact that [the employer] did not interview [the employee] does not establish pretext."). In stark contrast here, the investigation was allegedly flawed at its root: it was led by a person partly responsible for the violation.

Dupont seeks to salvage the propriety of the investigation and ultimate termination by arguing that Oubre was the ultimate decisionmaker and did not know of Schorr's involvement. (*See* Doc. 41 at 2). Plaintiffs counter that the "cat's paw" theory, which plaintiffs use when they "cannot show that the decisionmaker—the person who took the adverse employment action—harbored any" discriminatory animus, *Zamora v. City Of Houston*, 798 F.3d 326, 331 (5th Cir. 2015), allows discriminatory animus on the part of Schorr and others to be imputed to Oubre. (*See* Doc. 49 at 2). The Court agrees that the "cat's paw" theory is appropriate here, because in Plaintiffs' version of events, Schorr's deeply flawed investigation caused Oubre's ultimate decision–"in effect manipulating the decisionmaker into taking what appears to the decisionmaker to be a non-retaliatory action." *Zamora*, 798 F.3d at 335 (5th Cir. 2015). Schorr led the investigation, collected evidence, and presented that evidence to Oubre, recommending termination. It is reasonable to infer from this information that termination would not have occurred but for Schorr's efforts. *Time Warner Operation, Inc.*, 98 F.3d at 181 (explaining that at summary judgment, a court views all facts and inferences in the light most favorable to the nonmovant).

Again, the Court cannot weigh evidence at this stage. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150. Based on the evidence before it, the Court

finds that Plaintiffs have raised a genuine dispute over the material issue of fact that is Dupont's real reason for terminating Plaintiffs.

## III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Dupont Specialty Products USA, LLC's Motion for Summary Judgment be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 21st day of June, 2024

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**